Eaton vs. Vaughan.

APPEAL from Greene Circuit Court.

---

EATON vs. VAUGHAN.

1. In an action of trespass against the captain of a steamboat for taking away a slave on his boat, it is not necessary to show that he knew the person to be a slave.
2. Ordinary diligence used in attempting to ascertain if he were a slave, is no justification to the person carrying the slave away.

ERROR to Howard Circuit Court.

ADAMS & HAYDEN for Plaintiff.

Eaton vs. Vaughan.

To reverse the judgment of the circuit court the plaintiff in error will insist upon these points:

1. That the defendant was not liable if he *bona fide* believed the person to be a free man, and merely permitted him as such to go on his boat as a passenger. See 7 Dana Ky. Rep. 252; Story on Bailments, section 591; 2 Cowper, 476.

2. That the damages were excessive and outrageous.

LEONARD for Defendant.

In support of the judgment of the circuit court, the counsel for the plaintiff below will rely upon the following points and authorities:

1. The defendant's voluntary act of receiving the plaintiff's slave upon his boat as a passenger, and carrying him as such passenger to St. Louis for a reward, without the consent and against the will of the owner, is a trespass; Tyson vs. Ewing, 3 J. J. Marshall, 186.

2. When the act, which is the immediate cause of the injury, is the voluntary act of the party, he is liable to the party injured for all the damages occasioned thereby; and it is no justification or excuse that he acted in good faith, and after the use of the utmost diligence, in the belief that he was doing a lawful act.

If the act be not voluntary the defendant is still liable, unless it happened utterly without any fault on his part; and it is not enough that he used ordinary diligence to guard against injury.

Upon the proof in the cause, the court was warranted upon either of these principles in giving the plaintiff's instructions, and rejecting those moved by the defendant; Weaver vs. Ward, Hobart's Rep. 290; Scott vs. Shephard, 3 Wilser's Rep. 407; Boss vs. Letton, 24 Eng. Com. L. Rep. 384; Goodman vs. Taylor, 24 Eng. Com. L. Rep. 385; Jennings vs. Fundeburg, 4 McCord's Rep. 161; Vincent vs. Stinehour, 7 Vermont Rep. 63; Bullock vs. Babcock, 3 Wend. Rep. 392, 6, Bac. Abr., title Trespass, page 589.

3. If the excuse set up by the defendant, that he was a common carrier, and as such received the plaintiff's slave upon his boat as a passenger, in good faith, and after the use of reasonable diligence, in the belief that he was a free man, be a good justification or excuse for the act done, yet such defence cannot be given in evidence under the general issue, but must be specially pleaded in bar; 1 Chitty's Pleadings, (7 edition) 538; Boss vs. Letton, 24 Eng. Com. L. Rep. 132; Knapp vs. Salisbury, 2 Camp. Re. 500; Co. Litt. 282; 2 Esp. N. P. 558.

4. Where the law has prescribed no measure of damages, but sub-

mitted that matter to the discretion of the triers of the fact, this court, it is believed, has never yet reversed a judgment merely upon the ground of excessive damages. But if that cause be sufficient in any case, the present damages are not such as to warrant this court in interfering with the verdict; Tyson vs. Ewing, 3 J. J. Marshall Rep. 186; Beardmon vs. Carrington and others, 2 Wilser's Rep. 258; Wilsferd vs. Berkley, 1 Burr. 609; Duberly vs. Gunning, Tenn. Rep. 651.

Scott, J., delivered the opinion of the court.

Vaughan brought an action of trespass against Eaton, under the following circumstances: Vaughan resided at Glasgow in Howard county, and owned a slave named Charles, who was reared in that county by his father-in-law, Wm. Ward. On the night of the 22d August, 1844, Charles escaped from Vaughan, and as the steam boat Wapello, of which Eaton was captain, was then lying at the port of Glasgow, and a suspicion arising that Charles was on board the boat, early next morning diligent search was made for him, but he was not found. Charles was described to the officer of the boat who made the search. Eaton was very indignant that a suspicion should have arisen that the slave was on his boat. On the same day on the return of the boat to St. Louis, she stopped at Boonville, and Charles who had stolen a horse, and taken the papers of a free negro to whom he bore some resemblance, presented himself to Captain Eaton, and asked if he could take passage on his boat to St. Louis, remarking at the same time to the Captain, that he supposed he would like to see his free paper. The captain replied he would; and a license to reside in this State, under the hand and seal of the clerk of the Howard county court was exhibited, examined and handed to Captain Nichols of Glasgow, a passenger, of whom the enquiry was made, whether it was genuine? Nichols replied it was. Charles thereupon paid his passage money, and was admitted as a passenger without any questions. At this time a stranger stepped up and said he knew the boy, and that he was raised by Wm. Ward of Howard county.

Pompey Spence, the free negro to whom the license to reside in this State had been granted, and from whom it was stolen, was described in said license as a mulatto boy, about 22 years old, five feet eight inches high, and straight hair, with his right hand having been broken. Charles was a mulatto boy about 24 years old, five feet eleven inches high, with sound hands and a scald head, having very little hair upon it, the top of his head being entirely bald. Charles called himself

Eaton vs. Vaughan.

Pompey. A witness who had seen Charles on the boat, saw after-wards Pompey Spence whom Charles personated, and testified that they were very much alike in face, countenance and complexion ; and that a person not knowing either boy, and not seeing them together, might easily mistake the one for the other. The officer who searched the boat for Charles at Glasgow, and heard a description of him after-wards, on their passage to St. Louis examined him and compared him with the description in the license, and was satisfied that he was the person to whom the license had been granted. On the examination, Charles extended his right hand, and made it appear as if he could not shut one of his fingers. Captain Eaton, near the mouth of the Missou-ri river, was informed by the cook of the boat, that he believed Charles was a runaway slave. This induced Eaton again to examaine Charles. The examination took place in the presence of the officer who searched the boat at Glasgow, and resulted in the conviction that Charles was the person he pretended to be. There were on board of the boat ten or twelve passengers from Glasgow and Fayette, some of whom knew Charles; but it does not appear that any inquiries respecting him were made of them, or that Eaton knew that they were acquainted with the slave.

Fifty or a hundred persons were at the boat landing at Boonville, when Charles took passage.

Charles was taken to St. Louis, and has never been heard of since. But for his having a scald head he was estimated to be worth $600. The scald did not affect his capacity for service, and might reduce his value fifty dollars; he was otherwise a very likely boy.

Evidence was given of expenses incurred in seeking to find the boy.

The declaration contained two counts. One charged the defendant with taking and carrying away the plaintiff's slave, whereby he was wholly lost to the plaintiff. The other charged that the defendant took and carried away the slave, and converted him to his own use.

The court instructed the jury at the instance of the plaintiff, that in order to entitle him to recover, it was not necessary that the defendant should have taken off the boy, knowing him to be a slave. Nor is it sufficient to excuse the defendant from such liability, that he in good faith believed the boy to be a freeman, and used reasonable diligence to prevent imposition by the boy.

That the jury may, if they think proper, give smart money against the defendant, over and above all the damages actually sustained by the plaintiff.

The defendant asked instructions asserting a doctrine directly the
47

reverse of that contained in the first of the above instructions given at the instance of the plaintiff, which were refused by the court.

The court then told the jury that the evidence disclosed mitigating circumstances in the conduct of the defendant.

The plaintiff obtained judgment for nine hundred dollars.

At the common law, in an action of trespass for enticing away a servant, it was necessary to allege and prove a *scienter*, that the person enticed away was a servant. In England, servants were of the same race and color as freemen, and all persons are supposed to be free. If, says Lord Coke, a free man married a *neif*, she thereby became free, and the lord had his action against the husband to recover her value. And albeit he did not know her to be a *neif*, yet the action lieth against him; for he must take notice thereof at his peril, unless she be out of the service of the lord and vagrant; and then if one not knowing her to be a *neif*, marrieth her, some say that in that case no action lieth againt the husband. 1 Coke 426. A *villain in gross* at the common law, says Littleton, could be conveyed only by deed; the lord was considered as having a right to his services, and not that property in his person which he possessed in other things. But this view of the subject has not been adopted by the slave States in this Union; for however the humanity of our laws may protect slaves from the cruelties of their masters, yet they are as strictly property as any other chattels. Trespass will not lie for animals *ferae naturae*, for the reason that there is no property in them; but if one of those animals be reclaimed, and is afterwards destroyed by a trespasser, would it be any defence to the action to say that there was no knowledge that the plaintiff had property in the animal? If a ferryman sets a slave across the Mississippi, without the consent of his master, whereby he is lost, would it be any answer to an action of trespass to say he had good reasons to believe that the slave was a free man? A tortious act, though accidental, will be a cause of action. It is not necessary that it be willful and malicious. 1 Willis 577. In the case of Ward vs. Weaver, Hob. 290, it was said that no man shall be excused of a trespass except it may be judged utterly without *his fault*. It must appear that the act was inevitable. Our slaves would be very much impaired in value, if injuries to our property in them could go unredressed, under the plea that those who committed them were ignorant of the fact that they were slaves. Every negro asserting his right to freedom, is presumed a slave, and it devolves on him to show his right to the condition which he claims. It is true, slaves have volition; they may leave the service of their masters, and may impose themselves on others for free men, but it is necessary for the security of the owners of

Eaton vs Vaughan.

such property, that they who treat them as such should do it at their peril. The strict prohibition against trading with slaves without the written consent of their masters, and the great disproportion of the number of free negroes to that of the slaves, lessen very much the seeming severity of this rule.

In the case of Tyson vs. Ewing, 3 J. J. Mashall, the court says, slaves although protected in life and limb by the humanity of our laws, are nevertheless regarded as property in the strictest sense of the term. And as far as it respects the form of the action, we do not feel ourselves authorized to discriminate between them, and any other kind of property.

We have seen the recent case of Nelson vs. Whitmore, 1 Rich. S. Car. Rep., a case somewhat similar to this in its circumstances, being an action to recover the value of a slave who was a bright mulatto, freckled, and with hair somewhat reddish, and who, in the opinion of some, was white, but others thought him a mulatto; in that case it was held, that a knowledge of the fact that the boy was a slave, was necessary to be proved. That the idea of property was of the essence of a conversion, and that when there was no appropriation of property, there could be no conversion. This doctrine, it was admitted, was derived from the common law, under which servants were of the same race and color as their masters. But we do not feel ourselves at liberty to make any discrimination between the property in our slaves, and any other chattels. They who interfere with it to the prejudice of our rights, do it at their peril, otherwise there will be no security for it.

We do not think that the instruction of the court in relation to smart money was correct.

The jury should not have been told that they might give it, if they thought proper. Such damages can only be given when the circumstances of the case warrant it. The error, however, of this instruction was in some measure obviated by the subsequent charge, in which they were reminded of the mitigating circumstances of the defendant's conduct. As there were expenses incurred in endeavoring to recover the slave, and as his worth was estimated by some at $550, we do not think the excess of damages so great, as would warrant us in setting aside the verdict. We do not feel assured, all things considered, that such a course would ultimately prove an advantage to the defendant. There is nothing in this transaction which throws the least suspicion upon the purity of Captain Eaton's conduct. That some diligence was employed by him, cannot be denied; but that a greater degree of diligence would in all probability have prevented the loss to the plaintiff, can-

dor compels us to avow.   We think that the hope of making his escape on the boat, manifestly induced the slave to runaway.  The facility of escaping on the boats navigating our waters, will induce many slaves to leave the service of their masters.  Their ingenuity will be exerted to invent means of eluding the vigilance of captains, and many ways will be employed to get off unnoticed.   One escape by such means, will stimulate others to make the attempt.   The greater portion of our eastern frontier, being only separated by a navigable stream, from a non-slaveholding State, inhabited by many who are anxious, and leaving no stone unturned to deprive us of our slaves; our interior being drained by large water courses, by means of which its commerce in steamboats is maintained with the city on our frontier, render it necessary that the strictest diligence should be exacted from all those navigating steamboats on our waters, in order to prevent the escape of our slaves.   Our citizens, aware of the circumstances by which they are surrounded,  will not weigh in golden scales the damages that may result to the owners of slaves, from a relaxation of that degree of diligence  which is necessary to secure them against losses.  This determination they will carry with them in their jury rooms, and it is not for the courts to weaken or destroy the force of a determination, necessary to protect a species of property which, whether for weal or for woe, has been entailed upon us by those who are now making the most clamor about it.

Judge McBRIDE concurring, the judgment will be affirmed.

NAPTON, Judge.

I am in favor of sending this case back for a new trial, upon the ground that vindictive damages were given by the jury, when the circumstances of the case did not warrant it.   The value of the slave, when in Vaughan's possession, was about five hundred dollars, and that value must have been much diminished at the time he imposed himself upon Captain Eaton, by the fact that he was then a runaway, had stolen a horse, and was in possession of free papers which would very much facilitate his escape.   The verdict was for nine hundred dollars.   It is conceded that Captain Eaton was imposed upon; that he was actuated by no improper motives; that he was  guilty of  no  gross negligence, though he may not have used the utmost diligence.   Upon what principle then, shall the jury be told that *if they think* proper they may allow smart money?   Neither justice nor sound policy requires the infliction of a punishment upon the defendant, unless his conduct has been such as to deserve censure.